UNITED STATES of America

v.

KNOX COAL COMPANY, Robert L. Dougherty, August J. Lippi, Josephine Sciandra and Louis Fabrizio, August J. Lippi, Appellant.

No. 14803.

United States Court of Appeals Third Circuit.

Argued Oct. 8, 1964.

Decided June 21, 1965.

As Amended June 25, 1965.

**7.** Act, § 35; Id. § 17j.34.

Jacob W. Friedman, New York City, (Edwin M. Kosik, Scranton, Pa., on the brief), for appellant.

John P. Burke, Criminal Tax Div., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., on the brief), Bernard J. Brown, U. S. Atty., Washington, D. C., of counsel, for the United States.

Before KALODNER, GANEY and FREEDMAN, Circuit Judges.

GANEY, Circuit Judge.

The Knox Coal Company ("Company") was indicted on March 10, 1961, along with four individuals named respectively Robert L. Dougherty, Josephine Sciandra, Louis Fabrizio and August J. Lippi. The indictment contained seven counts. Six of them were based on violations of

26 U.S.C.A. § 7201[1]; the other on a transgression of 18 U.S.C.A. § 371, the general conspiracy section of the Criminal Code. Count I in substance charged the Company alone with willfully attempting to evade and defeat a large part of the taxes due and owing by it for the fiscal year ended June 30, 1957, by filing and causing to be filed a false income tax return for that period when it knew that the tax due was understated therein by $80,445.45. Count II accused the four individuals with having conspired from on or about July 1, 1956, to September 12, 1957, (the date of the filing of the return) to commit the offenses of willful attempts to evade and defeat the corporate income taxes of the Company for the fiscal year ended with June 30, 1957. Count III charged the same four individuals with the substantive offense of willfully attempting to evade and defeat the payment by the Company of $80,445.45 in income taxes for the fiscal year ended June 30, 1957, by causing to be entered on the payroll records of the Company the names of persons who were not employees of the Company; causing funds of the Company to be paid in the form of wages to or in the names of those persons; causing to be entered on the books and records of the Company, and causing funds of the Company to be paid in the form of costs and expenses which they knew were not in fact costs and expenses of the Company; and causing the Company to claim falsely in its Federal income tax return for the fiscal year ended June 30, 1957, income tax deductions for those payments. Counts IV and V averred that Sciandra did willfully attempt to evade and defeat income taxes owed by her for the years 1956 and 1957. Counts VI and VII claimed that Fabrizio did also willfully attempt to evade and defeat a large part of his income taxes for the same years.

1. This section of the 1954 Internal Revenue Code provides: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to the other penalties provided by law, be guilty of a felony * * *."

Lippi's motion to dismiss the indictment for alleged insufficiency was denied by the district court. Each of the defendants except Lippi filed a motion for severance. These motions were denied. The Company, Dougherty, Sciandra and Lippi plead not guilty to the charges against them. Fabrizio plead guilty to Counts III and VI. Immediately prior to trial, counsel for the Company withdrew from the case. Additionally, Counts II and VII, against Fabrizio, with the consent of the Government, were severed; and the Court, apprised of Dougherty's being hospitalized, stated it would proceed without him with no objection from either the Government or Dougherty's counsel. The Company, unrepresented by counsel, went to trial under Count I, Sciandra and Lippi under Counts II and III, and Sciandra under Counts IV and V. After a trial at Lewisburg, Pa., which began on April 2, 1961 and ended on April 13, the jury found the three defendants guilty on the counts under which they were tried.[2] Thereafter, Sciandra and Lippi filed motions for arrest of judgment, for judgment of acquittal and for a new trial. These motions were denied on December 20, 1962.[3] Lippi filed a motion for a new trial on the grounds of newly discovered evidence. This motion was denied on October 10, 1963.[4]

The Company was fined $10,000. On Count II, Lippi was sentenced to pay a fine of $5,000 and to serve three years in prison. On Count III, imposition of sentence was suspended and he was placed on probation for three years to begin on his release from prison under Count II, "A condition of probation being that all delinquent taxes shall be paid." Sciandra and Fabrizio also received fines and sentences. With the consent of the district court, Counts II and VII were dismissed as to Fabrizio. Only Lippi has appealed.

## I.

Lippi's first contention is that the district court erred in denying his motion for arrest of judgment as to Count II because it failed to allege a crime against the United States. That motion was based on the ground that the count fails to charge a crime against the United States because it does not, excluding the last paragraph under the overt acts, allege, as is asserted under Counts I and III, that a tax in excess of that reported by the Company was due the United States.

█ Happily, the rule that an indictment, to be sufficient, must contain all the elements of a crime "and sufficiently apprise the defendant of what he must be prepared to meet" is still a vital part of our Federal criminal jurisprudence. Russell v. United States, 369 U.S. 749, 763–766, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); United States v. Deutsch, 243 F.2d 435 (C.A.3, 1957); United States v. Tornabene, 222 F.2d 875, 878, (C.A.3, 1955). At page 765, 82 S.Ct. at page 1047 of the Russell case, supra, the Supreme Court states:

"* * * 'In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished; * * *.' United States v. Carll, 105 U.S. 611, 612 [26 L.Ed. 1135]. 'Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.' United States v. Hess, 124 U.S. 483,

---

2. No attorney made any opening or closing address for the Knox Coal Company, no witnesses were examined for or called by the Company, nor did anyone make any objections, trial or post-trial motions on its behalf.

3. The opinion has not been published.

4. The opinion has not been published.

487 [8 S.Ct. 571, 31 L.Ed. 516]. See also Pettibone v. United States, 148 U.S. 197, 202–204 [13 S.Ct. 542, 37 L.Ed. 419]; Blitz v. United States, 153 U.S. 308, 315 [4 S.Ct. 924, 38 L. Ed. 725]; Keck v. United States, 172 U.S. 434, 437 [19 S.Ct. 254, 43 L.Ed. 505]; Morisette v. United States, 342 U.S. 246, 270, n. 30 [72 S.Ct. 240, 96 L.Ed. 288]. Cf. United States v. Petrillo, 332 U.S. 1, 10–11 [67 S.Ct. 1538, 91 L.Ed. 1877]."

Section 7201 of the Internal Revenue Code of 1954 proclaims that any person who willfully attempts to evade or defeat any tax imposed by Title 26 in any manner shall be guilty of a felony. In Sansone v. United States, 380 U.S. 343, p. 351, 85 S.Ct. 1004, p. 1010, 13 L.Ed.2d 822 (March 29, 1965), the Court states: "[T]he elements of § 7201 are willfulness; the existence of a tax deficiency, Lawn v. United States, 355 U.S. 339, 361 [78 S.Ct. 311, 2 L.Ed.2d 321]; Spies v. United States [317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943)], supra, 317 U.S. at 496 [63 S.Ct. at 366]; and an affirmative act constituting an evasion or attempted evasion of the tax, Spies v. United States, supra."

■ In its introductory part, Count II names the Company as being a corporation with its business office at Exeter, Pa.; it identifies Dougherty as having been president of the Company during the conspiracy; Fabrizio as secretary and treasurer; Sciandra as a stockholder; and Lippi as president of District 1, United Mine Workers of America. It then goes on to charge that these four individuals did unlawfully, knowingly and willfully conspire together and with other persons unknown to commit certain offenses against the United States, to wit:

"(a) The offenses of wilful attempts to evade and defeat, corporate income taxes of Knox Coal Company for the fiscal year ended June 30, 1957, a felony, in violation of Section 7201 of Title 26 of the United States Code."

This quoted portion does not incorporate by reference or refer to any other part of the count or indictment. Of course, unless the charging part of a conspiracy count specifically refers to or incorporates by reference allegations which appear under the heading of the overt acts, resort to those allegations may not be had to supply the insufficiency in the charging language itself. Joplin Mercantile Co. v. United States, 236 U.S. 531, 535, 35 S.Ct. 291, 59 L.Ed. 705 (1915); United States v. Deutsch, supra, 243 F. 2d at 436. Also see United States v. Apex Distributing Co., 148 F.Supp. 365, 370 (D.C.R.I.1957). However, the failure of the charging part to declare that a tax in excess of that reported was due is not fatal. In a conspiracy count, the conspiracy is the gist of the offense. Where, as here, the purpose of the conspiracy is the performing of acts which are made an offense by another section of the Criminal Code, every element of that offense need not be set forth. A conspiracy count need not plead the substantive offense letter-perfect because the purpose of the conspiracy may have been accomplished even though such activity fell short of completing a substantive offense. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211 (1915).

■ Lippi also claims that the count does not fully and clearly set forth the purpose of the conspiracy. In Pettibone v. United States, 148 U.S. 197, p. 203 13 S.Ct. 542, p. 545, the Supreme Court observes:

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means, and the rule is accepted * * * that when the criminality of a conspiracy consists of an unlawful agreement of two or more persons to compass or promote some criminal or illegal purpose, that purpose must be fully

and clearly stated in the indictment
\* \* \*."

If Count II stated no more than that quoted in paragraph (a), though it restricts the charge to a single year, it would be insufficient. But the count does not stop there. It goes on to state that the Grand Jury further charges that the conspiracy was to be accomplished by the "means and method and in the manner following:". It was a part of the plan and conspiracy that false payroll records be created for the Company which would list as "corporate employees persons who would not, in fact, be employees of the corporation and who would perform no services for the corporation," and that funds of the Company would be "paid in the form of wages or salary payments to or in the name" of those persons, and that the Company on its payroll records and income tax returns for the fiscal year ended June 30, 1957, would claim Federal income tax deductions for wages or salaries paid and to be paid to or in the name of those persons. Then follows the listing of the overt acts in thirteen numbered paragraphs. The first four state that each of the four individual defendants respectively caused the name of a certain person to be listed on the payroll records of the Company. The next eight assert that Dougherty and Fabrizio disbursed funds of the Company to or in the name of eight separate individuals. The last paragraph avers that Dougherty filed or caused to be filed a knowingly false Federal income tax return for the Company for the fiscal year ended June 30, 1957, wherein the tax due was understated by $80,445.45. What the Grand Jury further charges, Lippi argues, may not be considered as a part of the charging part of the indictment. This argument is without merit.

▮ Another important aspect, Lippi says, in which this count is fatally defective is that it charges a conspiracy to commit "the offenses of wilful attempts"—both terms being averred in the plural. Of course it was not necessary for the count to assert an agreement to commit the offense of willful attempt in the plural. But we fail to see how Lippi was harmed by this form of assertion. A conspiracy count may allege a purpose to commit multiple substantive offenses, and it is not duplicitous if it does so. Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942). As has been adverted to earlier, in a conspiracy count, the conspiracy is the gist of the offense, and though the count charges an agreement to commit several crimes or several acts, each one of which may be the basis for an indictment, the count charges but one offense under 18 U.S.C. § 371.

The indictment contains all the elements of a crime under 18 U.S.C. § 371 and sufficiently apprised Lippi of what he was to meet; and in case any other proceedings are taken against him for a similar offense, the record shows with accuracy to what extent he may plead his conviction under Count II. For example, see United States v. Jackson, 344 F.2d 158 (C.A.3, 1965). The trial court did not err in denying his motion in arrest of judgment.

II.

Lippi complains on three grounds that the trial court committed reversible error in denying his motion for a new trial. The first is the court's failure to instruct the jury to disregard certain declarations of an alleged co-conspirator made after the termination of the conspiracy. A brief summary of the pertinent facts shown by the Government in its case-in-chief, followed by some excerpts from the trial court's admonition and instructions to the jury about the statements in question will demonstrate, in our opinion, that they were properly admitted into evidence as far as Lippi is concerned, and are not to be considered as being prejudicial.

To prove the conspiracy involving Lippi, among others, the Government produced evidence to show that Lippi's relationship with the other three individually named defendants was more than appeared on the surface, and that

he had received payments from the Company. This evidence showed the following: The Company was in the business of mining and selling coal. It maintained payroll and general fund checking accounts at The First National Bank of Exeter ("Bank"), Exeter, Pennsylvania, of which Lippi was either president or chairman of its board of directors and Dougherty was vice-president and a director from 1955 to about 1960. Checks issued by the Company were signed by Fabrizio and Dougherty. Although the Company's stock-book, as of December 18, 1950, showed Sciandra and Fabrizio as being the only stockholders and each owning 495 shares of the Class A stock, a trust agreement of the same date, signed by each of the individual defendants, lists the owners of that class of stock and the number of shares owned by each as follows: Sciandra, 280; Fabrizio, 330; and Lippi, 280. The trust agreement refers to these three as "Shareholders", and to Dougherty as "General Manager". It recited that the parties were desirous of entering into an agreement concerning the disposition of their shares on the respective deaths of any one of them, and securing the continued services of Dougherty as general manager by granting him rights to purchase shares of the Company. Upon the death of any shareholder, the surviving shareholders and Dougherty, if he is in the employ of the Company as general manager, agree to purchase in equal portions the shares of the deceased shareholder to be applied to the purchase price. No shareholder was to sell his shares without first offering them for sale in equal portions to other shareholders. Thus, it can be seen that Lippi was a substantial shareholder in the Knox Coal Company while, at the same time, he was president of the unions in whose district the Company was operating. Pursuant to the trust agreement, each of the shareholders took out insurance in the amount of $25,000 on the life of each of the other two shareholders; Dougherty also obtained insurance in the same amount on each of the lives of the three shareholders. Up until 1957, the Company paid the cost of the annual premiums amounting to $10,851.72 on these policies.

Upon an examination of the Company's records for the years 1955 and 1956 by an agent of the Internal Revenue Service, the payment of the cost of the insurance premiums was declared by him to be actually a dividend payment by the Company in the year 1956 to the three shareholders. In addition, two recorded cash dividends were declared by the Company: $2,500 in 1956, and $4,000 in 1957. During his investigation, the agent came across two checks, one for $2,500 dated October 16, 1956, and the other for $4,000 dated January 16, 1957. Both of them were made out to cash and canceled, without their having been endorsed, by the Bank. There was no evidence that these checks had been previously negotiated before they were presented to the Bank. One George J. Daileda, a former cashier at the Bank for many years and close associate of Lippi, testified that the latter had presented these checks to him for cashing at the Bank. Additionally, Lippi's Federal income tax return for the calendar year 1956 lists $6,117.52, which happens to be equal to the total of $2,500, the amount of the cash dividend just adverted to, and an amount equal to one-third of the annual cost of the premium payment paid by the Company in that year, $10,851.72 or $3,617.24. This further is indicative of the fact that Lippi was no stranger to the Company. His return for 1957 shows $4,000 as dividends received by him, without giving the source.[5, 6]

---

5. Substantially this same evidence, with the exception of George Daileda's statements, was presented in a trial held at Wilmington, Delaware, in the United States District Court for the District of Delaware. See United States v. Lippi, D.C., 190 F.Supp. 604 (1961), and 193 F.Supp. 441 (1961).

6. Lippi's counsel made a number of requests for points for charge. One of them, which the trial court adopted, contained the following sentence: "No corporation can by

For the fiscal year ending June 30, 1957, the Company included in its deductions for Federal income tax purposes the following disbursements totaling $161,702:[7]

(a) Wages and vacation payments ................. $131,582
(b) Drainage expenses ...... 18,120
(c) Miscellaneous expenses ... 12,000

(a) The amount of $131,582 had been distributed by payroll check payments over the fiscal year to some 32 people, a majority of whom were female, who performed no services for the Company. Some of them were children in their early teens. One of them was an examiner on pension, another was over seventy years of age. With one exception, those named had not been entered in the timebook, the information from which, along with the rate of pay, was the basis for making up the regular payroll. Some of the payments were substantial and approximated those ordinarily paid to a superintendent or foreman in the coal mining industry. The payroll sheets issued semi-monthly and monthly containing the names of these people were marked with four X's to distinguish them from the regular payroll sheets or those actually working for the Company as miners, clerks, etc. The names on these sheets were divided into four groups, those of Lippi, Dougherty, Sciandra and Fabrizio. The grouping could be easily observed from the location of the names on the records. Likewise, vacation payments were made to each group in identical amounts even though the number of persons in each group varied. When vacation payments were increased, each group received an identical increment. Some of the individuals received vacation payments even though their names had not been listed previously in the payroll sheets. The connection of each of the individual defendants with one of the four groups could be ascertained by his or her blood relationship or friendship to the people within that group. The persons in the group attributed to Lippi consisted of his married daughter, nephew, brother-in-law and personal secretary. Also, the wife of the latter, a life-long acquaintance, Mary Friday, who was a school principal, and two other persons who knew him. One of the latter was Carmelo Sciandra, no relation to the defendant herein, Josephine Sciandra.

Daileda testified that Lippi presented to him for cashing Company checks made out to his brother-in-law and to Carmelo, and that he presented for deposit to the account of Mary Friday, his life-long friend, twenty-one out of twenty-four checks made out to her. He also stated that he did not know Carmelo and that Lippi had given him a photograph of Carmelo so that he would be able to identify him in the event he was questioned about the checks made out to Carmelo. He also stated that when Lippi was on vacation for approximately six weeks, his secretary brought in the checks issued during that period and he (Daileda) set the cash aside in the Bank until Lippi returned. This is only partial evidence in the record showing an overwhelming amount of testimony connecting Lippi with Count II, the conspiracy count in the case. Further vacation payments were made to the various four groups and in all of the four groups the Government's Exhibit No. 158, which was admitted into evidence as a summary of the various payments made to alleged employees, showed for the fiscal year ended June 30, 1957, that, with a few exceptions, each one of them had been paid a total of $800, while the Company checks representing these payments were in varying amounts. This is clearly indicative that these payments were spurious, for it was highly improbable that each one of them would have received vacation payments in exact total amounts

violating the law make any one of its stockholders who does not himself participate in that violation criminally liable therefor."

7. This total was $200 more than the amount claimed to be overstated as deductions in the indictment.

if they had been bona fide employees. Proof of the vacation payments were relevant under Count II, as well as under the other counts.

(b) The $18,120 for "drainage" expenses was paid out in 48 checks during the fiscal year ended June 30, 1957.

These so-called expenses were set forth in the Company's purchase journal but no corresponding invoices were found in the Company's records. The checks were issued at the rate of two each semi-monthly and monthly period. Each time, one of them was made out to "Joseph Boccacini", and the other to "Louis J. Melosi". None of the working personnel at the Company appeared to know who these persons were. The Internal Revenue Service had no record of their having filed income tax returns for the years 1956 or 1957. According to the Company's records, Boccacini's address was the same as that of Lippi's married daughter, and Melosi's was identical to that of Lippi's nephew. Although the checks were in varying amounts, they invariably totaled $755 semi-monthly and $1,510 monthly. They were prepared by the Company's bookkeeper at the direction of Dougherty, and canceled by the Bank without their having been previously negotiated. Daileda also testified that it was Lippi who presented to him for cashing at the Bank the Boccacini and Melosi checks without their having been endorsed, and that he, Daileda, endorsed them by signing the payee's name.

(c) The disbursement of the $12,000 under the heading of "miscellaneous" expenses was by means of twelve $1,000 checks, each made out to "cash". They were issued monthly in the fiscal year ended June 30, 1957. No invoices corresponding to these expenses appeared in the Company's records, nor did they, unlike the "drainage" expenses, appear in the purchase journal. The checks, without endorsement or having been negotiated before, had been canceled by the Bank. Proof of the same nature of the "drainage" and "miscellaneous" expenses was probative of the allegations under Counts I and III only, as "drain-age" and "miscellaneous" expense payments were not included under the conspiracy charge in Count II.

Daileda also testified that Lippi likewise presented the twelve $1,000 checks, made out to "cash". His testimony was the only evidence in the case from which it could be reasonably inferred that Lippi caused or aided and abetted the disbursement of the twelve $1,000 checks under Count III, and the only direct evidence implicating him with the "drainage" expense checks. If the defense could have effectively impeached Daileda in the eyes of the jury, the Government would not have been able to prove its case against Lippi under Count III. This witness was therefore subjected to broad searing cross-examination, during which the defense was not interrupted by the court or by objections on the part of the prosecution. On cross-examination, he admitted having given testimony at prior trials and to the Grand Jury and information to agents of the Internal Revenue Service which was either contradictory or did not correspond to the testimony he was presently giving on the witness stand. He also admitted that Lippi was instrumental in having him dismissed from his position at the Bank—after he had been employed there for some thirty-three years.

A Michael P. Malinak, an Internal Revenue Agent, testified that during his investigation of the Company's records for the fiscal year ended June 30, 1957, he came across the Boccacini and Melosi checks and the twelve $1,000 "cash" checks, and asked the Company's bookkeeper for some information about them. The latter referred him to Dougherty. Concerning his conversations with Dougherty, the agent testified:

"Mr. Dougherty told me these checks were paid to Louis Melosi and Joseph Boccacini but that these gentlemen did not perform drainage work for the Knox Coal Company or any other services directly connected with the operation of the mine. He stated they did perform some services for the corporation,

and he also stated that they were connected with the union in some manner." [8]

Lippi's counsel objected to this portion of the agent's testimony on the ground that it involved hearsay statements by one of the co-conspirators after the conspiracy had ended and therefore could only be considered against Dougherty. However, these statements evinced knowledge by Dougherty of a matter within the averments of Counts I and III, and, accordingly, in his capacity as president of the defendant Company, they were admissible against it under Count I since there was no objection on the part of the Company, the only one who could properly object on its part. The defendant, Lippi, has no cause for complaint concerning the admission into evidence of these statements by Dougherty for the most he could have insisted upon is that they not be used against him. The trial judge gave him that protection as shown by the following:

In response to the objection by Lippi's counsel to Dougherty's statements about the Boccacini and Melosi checks, the prosecuting attorney stated:

"Mr. Dougherty, if the Court please, was at the time president of the Knox Coal Company, and as such was acting for the Knox Coal Company in dealing with the Government during an audit of the Knox Coal Company's affairs. The Company, of course, could speak only through its president, Mr. Dougherty, and we submit Mr. Dougherty's explanations are for himself and the Company, and therefore they are admissible.

\* \* \* \* \* \*

"The corporation is on trial, Your Honor, and Mr. Dougherty was its only authorized agent to speak for it. He spoke while he was employed as an officer and he spoke on a matter for the corporation."

When Sciandra's counsel joined in the objection, the trial court made the following admonition:

"The jury will be instructed that this testimony has only application to the Knox Coal Company, and will have no bearing, no relation at all to the other two defendants."

■ Lippi argues that the purpose of the Government in offering the Dougherty statements quoted above into evidence was to implicate him under the guise of showing a case against the phantom Company defendant which he claims was not on trial but only nominally so. The Company, though unrepresented by counsel, was very much on trial. When a corporation is named as a defendant, it is always nominally so, because it can act only through its officers and agents.[9] If those having an interest in the Company did not insist on obtaining an attorney to represent it at the trial, it is no concern of the courts.

■ Regarding any claim of undue prejudice arising from the statements, we are not unmindful that there was a risk that the jury might transfer their knowledge of the statements received under Count I across the barrier of exclusion and use it in determining the guilt of Lippi under Count III as to which the statements were not admissible. See Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). However, it is to be remembered that Lippi did not ask that his trial be severed from that of the Company and, further, that the Court reminded the jury at the time of the ob-

---

8. There was no evidence that either Lippi or Sciandra were present when these statements of Dougherty were purportedly made, or that they assented to or authorized them. Dougherty was not arrested until March 23, 1961, thirteen days after the return of the indictment.

9. See New York Central & H. R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909); United States v. Dotterweich, 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943); Egan v. United States, 137 F.2d 369, 378–382 (8 Cir., 1943); Steere Tank Line, Inc. v. United States, 330 F.2d 719, 721–722 (C.A.5, 1963).

jection that the testimony had "no relation at all to the other two defendants." The only other two defendants on trial were Lippi and Sciandra. Later, in the Court's charge to the jury, the Court instructed the jury to the same effect.[10]

 Agent Malinak also testified that in looking over the records of the Company he was struck by the number of feminine names—seven of them alone had the last name of Dougherty—on the payroll sheets. The bookkeeper told him the explanation would have to come from Dougherty. To the prosecuting attorney's question did Dougherty make any statement, the agent replied:

"Yes, I asked him if there is any women working on the premises of The Knox Coal Company, and he stated there were no women working on the premises."

Despite the fact that this statement was about a matter involved in the first three counts, no objection was interposed to the question, nor a request made that the answer be restricted to the Company under Count I and Dougherty under Count II, and the trial court gave none at the time. If one is apprehensive that the admitting into evidence of the Dougherty statement about no women working on the Company's premises might be considered as error, it was harmless indeed in the face of other proof. As pointed out in Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953): "In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one. This is a proper case for the application of Rule 52(a) of the Federal Rules of Criminal Procedure. We hold that the error to be harmless." Also see Delli Paoli v. United States, 352 U.S. 232, 239–243, 77 S.Ct. 294, 1 L.Ed.2d

278 (1957). It seems obvious counsel's failure to object here was that so much evidence had already been introduced into the record as to the spuriousness of the wage and vacation payments to certain persons under Counts II and III, that this statement was merely cumulative and would have little or no effect on the determination of Lippi's guilt under those counts. Moreover, it has been held that where, as here, no objection is entered or instructions, cautionary or otherwise, are requested, any post-trial objection to the admissibility of the testimony is waived. See Rossetti v. United States, 315 F.2d 86, (C.A.9, 1963).

### III.

 The second ground for his contention that the trial court committed reversible error in refusing to grant him a new trial concerns references in the presence of the jury of Lippi's failure to testify. Section 3481 of Title 18 declares that a defendant's choice in not asking to be a witness shall not create any presumption against him. Comment, especially of the hostile variety, in the presence of a jury upon a defendant's choice not to testify on his own behalf is forbidden. Wilson v. United States, 149 U.S. 60, 65, 13 S.Ct. 765, 37 L.Ed. 650 (1893); Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709 (1895). When comment is made upon defendant's election not to take the witness stand, the trial court should condemn such references and "express to the jury in emphatic terms that they should not attach to the failure any importance whatever as a presumption against the defendant." Wilson v. United States, supra, 149 U.S. at 67, 13 S.Ct. at 767. The refusal of the trial court, after being requested by a defendant, to charge that his failure to testify in his own behalf does not create any presumption against him is plain error. Bruno v. United States, 308 U.S. 287, 60 S.Ct.

---

10. On this point the trial court charged: "Declarations or admissions of a defendant which are made after the conspiracy came to an end, however, or after the defendant in question withdrew from it, may be considered by you only in determining his guilt or innocence and are not to be considered as against any defendant who was not present when they were made."

198, 84 L.Ed. 257 (1939); Helton v. United States, 221 F.2d 338 (C.A.5, 1955).

The following concerns the facts:

(a) Against the advice of her attorney, Sciandra testified on her own behalf. In his summation, her attorney informed the jury as follows:

"Now this defendant took the stand upon her own insistence. She says, 'I want to tell these jurors what happened.' You saw her there * * *.

" * * * This woman does not know what questions she is going to be asked, and believe me for a lawyer to [put] a defendant on the stand, unless they themselves believe they are not guilty, don't do it, but she says she wanted to tell these people, and she did."

And a few minutes later he again mentioned the fact that she took the stand in the following context:

"Now, what did Mrs. Sciandra do? Why is she here? Did she hide anything? Now she got on the stand. She admitted to you that she put these people, her family, and she asked them to put them on the payroll * * *."

In his entire summation, he did not mention Lippi's name nor make any expressed or implied reference to him regarding his not taking the stand. Lippi's counsel did not interpose any objections to the remarks made by Sciandra's counsel at the time they were made or at the close of the summation nor ask for a mistrial. As a matter of fact, in his summation which preceded that of Sciandra's counsel, Lippi's counsel had occasion to emphasize the fact that "Mrs. Sciandra took the stand." Our denial of Mr. J. Tom Grimmett's petition for rehearing in United States v. Grimmett, 331 F.2d 703 (C.A.3, 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1919, 12 L.Ed.2d 1045, adequately disposes of Lippi's contention that he was prejudiced by the remarks of co-defendant's counsel.

(b) At the beginning of his rebuttal, the attorney for the prosecution informed the jury that he was going to answer some statements made by the attorneys for Lippi (Mr. Edwin M. Kosik) and Sciandra. At this point, the trial court interrupted him with the following reminder within the hearing of the jury: "I don't think there is any rebuttal of Mr. Kosik's case. He [Lippi] didn't take the stand. Doesn't that give him the final closing? You do have rebuttal as to Mrs. Sciandra. Don't you agree?" To which he answered, "Yes, I believe that is so because he didn't take the stand. What the judge has just remarked, that since Mr. Lippi didn't take the stand that we will be limited in our rebuttal remarks to what [Sciandra's attorney] had to say. So I will be more brief than I planned." On the basis of these remarks, Lippi's counsel did not seek a mistrial or request that customary instructions be given to offset them.

If a defendant may waive the protection of 18 U.S.C. § 3481 by testifying, he may do so by failing to object to the remarks made by the prosecuting attorney concerning his not taking the stand. Such remarks are not plain error, especially when the jury was adequately admonished by the trial court: Jackson v. United States, 102 F. 473, 487 (9 Cir. 1900); and it was made aware that he did not testify by the fact that one of the other defendants took the stand. Wright v. United States, 108 F. 805, 811–813 (5 Cir. 1901).

(c) Without being requested to do so by Lippi, the trial court included the following instruction in its charge to the jury:

"Now, the defendant, Mr. Lippi, did not take the stand. You will draw no inference from the fact that he did not take the stand. That is his right and his privilege. There is no burden on him to prove his innocence. By his plea of 'not guilty' he has made a complete denial of the charge. As indicated before, the Government has the burden of prov-

ing his guilt beyond any reasonable doubt.

"The law does not compel a defendant to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant to testify."

This admonition was repeated by the court prior to his dismissal of the alternate jurors. Lippi did not ask for a mistrial after these instructions were given.

Under the circumstances, the trial court did all it could short of declaring a mistrial to offset the remarks in question. Nobile v. United States, 284 F. 253 (3 Cir. 1922), Poliafico v. United States, 237 F.2d 97, 114–115 (C.A.2, 1957), cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; United States v. Agueci, 310 F.2d 817, 830–831 (C.A.2, 1962); United States v. DiCarlo, 64 F.2d 15, 18 (2 Cir. 1933); Robilio v. United States, 291 F. 975, 985–986 (6 Cir. 1923); 12 Cyc. of Fed.Proc. (3d ed.) § 48.181.

██ Moreover, the remarks of the prosecuting attorney and the instructions by the trial court could in no wise be construed as holding that Lippi's silence was evidence of guilt. See Griffin v. State of California, 85 S.Ct. 1229 (April 28, 1965).

### IV.

At the close of the direct examination of Daileda, Lippi's counsel moved the trial court, pursuant to 18 U.S.C.A. § 3500(b) of the Jencks Act, to instruct the prosecution to provide him with statements previously made by Daileda to the United States. Special Agent Reuben A. Gershuni of the Intelligence Division of the Internal Revenue Service had been assigned to investigate the affairs of the Knox Coal Company. During this investigation, he made a handwritten memorandum of an oral interview with Daileda on October 15, 1958, regarding Company checks presented to the Bank. This memorandum was given to defense counsel for their inspection and use. The prosecution admitted that in other cases, not pertinent to the one being tried, FBI agents had also taken statements of Daileda. On the prosecution's assurance that these statements had no pertinency to the subject matter of the testimony given by Daileda on direct examination, the defense waived the presentation of those statements for the in camera inspection by the trial court.

According to the Gershuni memorandum, Daileda stated that it was Carmelo Sciandra, then deceased, who had presented the "drainage" and "miscellaneous" expense checks and also the dividend checks made out to "cash" to him at the Bank, and that Carmelo had been introduced to him by one John Sciandra, also deceased.

Daileda had testified at two previous trials in which Lippi was a defendant. One in Easton, Pennsylvania, the other in Wilmington, Delaware. He also testified before the Federal Grand Jury for the Middle District of Pennsylvania. At the previous trials, Daileda stated on the witness stand that he could not remember who presented the dividend checks to him for cashing. During the trial in question, the prosecuting attorney assured the defense, who possessed the transcript of the prior trials, that Daileda's testimony before the Grand Jury to the extent it was germane to the subjects on which he had testified at the present trial was essentially the same as his testimony at the Wilmington trial. With this assurance the defense waived the production and inspection of the Grand Jury minutes.

On cross-examination the defense elicited from Daileda without reservation that he had lied at the prior trials and before the Grand Jury regarding his knowledge of the identity of the person who presented the checks to him at the Bank, and that the testimony given by him on direct examination was true. He also admitted that the information that he gave to Agent Gershuni on October 15, 1958, about Carmelo was false. Neither the trial court nor the defense

asked Daileda if he had given any other statements relating to the subject matter as to which he had testified on direct examination to agents of the Government. Nor did the defense request the trial court to do so.

After the trial of the present case had been concluded, a subsequent trial was had in which Lippi was defendant but which involved the Newport Excavating Company. There, the Government presented to Lippi's counsel a memorandum dated May 8, 1959, and prepared by Special Agent Anatole G. Richman during his investigation of the Newport Excavating Company. Lippi's counsel did not know of the existence of that memorandum until that time. It consisted of 231 questions put to Daileda and his answers to them. Question No. 202, the only one having any possible pertinency to the Daileda testimony, is as follows: "Did Mr. Lippi ever bring in anyone else's check other than his personal check?" Daileda's answer was recorded as "No." It is the Government's failure to have produced this memorandum pursuant to his motion under 18 U.S.C. § 3500(b) at the trial involved here that Lippi claims was prejudicial to him because he was prevented from using it to impeach Daileda at that trial. This was the basis for his filing of his motion under Rule 33 of the Federal Rules of Criminal Procedure for a new trial on the ground of after-discovered evidence— such evidence being the May 8, 1959 memorandum. The memorandum was made available for the district court which held there was no prejudice to the defendant and denied the motion for a new trial.

When the defense moves pursuant to the Jencks Act to have the prosecution produce prior statements of a witness after he has testified, the burden is on the trial court to ask the prosecution whether such statements exist. If statements are produced, it is up to the trial court not the jury, to determine, subject to review on appeal, whether they come within the definition of 18 U.S.C. § 3500 and "relates to the subject matter as to which the witness has testified." [11] Once this question has been determined, they should be given to the defense for its "examination and use." "[W]hether the statements may be useful for purposes of impeachment is a decision which rests, of course, with the defendant himself." Scales v. United States, 367 U.S. 203, 258, 81 S.Ct. 1469, 1501, 6 L.Ed.2d 782 (1961). Also see Killian v. United States, 368 U.S. 231, 243, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); United States v. Birnbaum, 337 F.2d 490, 497–498 (C.A.2, 1964). The Act "does not purport to affect or modify the rules of evidence regarding admissibility and use of statements once produced." Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1960); Clancy v. United States, 365 U.S. 312, 316 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Campbell v. United States, 373 U.S. 487, 493, n. 7, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); United States v. Berry, 277 F.2d 826 (C.A.7, 1960). When the statements are admitted into evidence, the prosecution may not rehash the question of their relevancy before the jury, but is free to argue within the bounds of reason the relative weight which it thinks the jury should give to them. Of course the defense may waive the production of all such documents or some of them. Here, Lippi's counsel agreed not to ask for the production of any statements as to which the prosecution assured him had no bearing on the testimony given by Daileda on direct examination. There was no showing that the United States Attorney knew of the existence of this statement at the time of the trial of his case and since it was given to an Agent of the Government in the investigation of a wholly different matter, we cannot say that it came within the framework of the defendant's re-

11. It has been said that the district court's determination is subject to the clearly erroneous rule. But see Williams v. United States, 338 F.2d 286, 289 (C.A.D.C., 1964).

quest at the time of this trial. This for the reason that an examination of the whole record indicates quite clearly that the checks presented to Daileda by Lippi in the Newport Excavating Case were those involving that company and, further, at the very beginning of the statement taken by Agent Richman, in which this question appears, Richman told him he was requested to appear for the taking of testimony in order to answer questions in connection with the Newport Excavating Company. The question here posed upon which the defendant relies for a reversal of the judgment of the lower court, when read in context shows it was in relation not to the Knox Coal Company but to an entirely different investigation concerning the Newport Excavating Company. To hold the United States Attorney responsible for not handing over this memorandum brought out in a case tried later than the one he was trying and concerning a different subject matter, would be widening the ambit of the Jencks Act out of all proportion to the ends it was sought to protect.

The district court in its opinion stated that it would be extremely doubtful whether the question and answer about checks issued by the Newport Excavating Company could be applied to those issued by the Knox Coal Company. It also stated that if the statement were to be used by the defense for impeaching the credibility of Daileda, the complete memorandum would undoubtedly have been excluded because it "is of such extremely cumulative nature and of doubtful applicability to the issue of credibility that it is too trivial to justify a new trial." It then went on to hold that the Supreme Court's comment in Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) is applicable to Lippi's request for a new trial. When the Rosenberg case was in this court, we held that even though the trial court's withholding from the defense a letter written to the prosecutor by a witness just before trial was error, the defense suffered no prejudice from

that error. In affirming "the judgment on which the Court of Appeals based its conclusion that the failure to require production of the letter was empty of consequence", the Supreme Court said: "Since the same information that would have been afforded had the document been given to defendant was already in the possession of the defense by way of the witness' admission while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the letter." Also see Killian v. United States, supra, 368 U.S. at 243–244, 82 S.Ct. 302 and Ogden v. United States, 303 F.2d 724, 737–738 (C.A.9, 1962).

■ Therefore even if we give Lippi the benefit of the doubt and assume that the district court erroneously held that the statement need not have been given to the defense at the trial we agree on the authority of the Rosenberg and and Killiam cases, supra, that it did not commit reversible error in denying Lippi's second motion for a new trial.

Accordingly, the judgment of conviction and sentence and the orders denying a new trial of the District Court will be affirmed.