UNITED STATES of America

v.

David WANDER.

David Wander, Appellant in Nos. 78–1983 and 79–1201.

Edward Reddington, Appellant in Nos. 78–1984 and 79–1202.

Nos. 78–1983, 78–1984, 79–1201 and 79–1202.

United States Court of Appeals, Third Circuit.

Argued March 20, 1979.

Decided June 27, 1979.

---

10. *See* note 7, *supra*.

11. *See* note 3, *supra*.

Brendan V. Sullivan, Jr., John M. Mason (argued), F. Whitten Peters, Williams & Connolly, Washington, D. C., James L. Weisman, Weisman, Pass, Swartz & Trimm, Pittsburgh, Pa., for David Wander.

George E. Schumacher, Pittsburgh, Pa., for Edward Reddington.

Robert J. Cindrich, U. S. Atty., David M. Curry and James J. West (argued), Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Co-defendants David Wander and Edward Reddington appeal from their convictions of conspiracy in violation of 18 U.S.C. § 371 (1976), and on three counts of violating the Travel Act, 18 U.S.C. § 1952 (1976). Of the issues raised on this appeal, we are persuaded by the defendants' contentions that the indictments on the Travel Act counts are defective and that the district court erred by amending the jury instructions. We therefore reverse the convictions, dismiss the indictments on the Travel Act counts, and remand the case for a new trial on the conspiracy count. Wander and Reddington also appeal from a denial of their motion for a new trial. Our disposition of the appeal from the judgments of conviction, however, renders this issue moot.

### I. THE FACTS

In 1973, David Wander was operating as a bail bondsman in Allegheny County, Pennsylvania with Edward Reddington serving as his assistant. In the course of his business dealings, Wander often came into contact with Robert Peirce, an attorney and Clerk of Courts for the Criminal Division, Court of Common Pleas of Allegheny

County. In his capacity as Clerk, Peirce initiated changes in the manner in which forfeitures of bail bonds were handled. These changes had a disagreeable impact on Wander and for a period of five months in 1972 he was forced to suspend operations for failure to satisfy a $100,000 collateral requirement.

In May 1972, Michael Currie, a female client of Peirce's, and her friend, Joseph Volpini, were arrested and charged with unlawful possession of drugs. Currie expressed her concerns to her acquaintance, Edward Reddington, that the charges might lead to a jail sentence and loss of custody of her daughter. Reddington had her meet Wander. Subsequent to the meeting, Reddington told Currie that if she could involve Peirce in an "embarrassing situation," she would be acquitted of the drug charges. Currie made no response at the time to this suggestion and in late February or early march of 1973 (the drug charges still pending), she went to Florida to live with her sister.

While in Florida, Currie received one long-distance call from Wander and one from Reddington. Wander's call involved a conference hookup with Peirce, during which Wander monitored Currie's conversation with Peirce without the latter's knowledge. Reddington requested Currie to return by plane to Pittsburgh, which she did on or about March 12, 1973. Although Currie had been told to return to Pittsburgh for disposition of her criminal case, upon her arrival, she learned that Reddington's purpose in having her make the trip was to have her fulfill the nefarious role he had previously plotted for her. On the morning of March 16, 1973, Reddington took Currie to a motel. After Currie called Peirce and invited him to her room, Reddington left. Peirce arrived and, while he and Currie were in bed together, a photographer entered the room, hurriedly snapped some pictures, and left.

Peirce returned to his office and immediately telephoned Agent John Portella of the FBI. Peirce recounted his humiliating experience at the motel and suggested Wan-

der as a suspect. Portella began an investigation, during the course of which he enlisted the assistance of Robert Butzler, police chief for Ross Township.

Butzler was able to obtain some pictures allegedly of Peirce and Currie in bed and tape recordings of telephone conversations between the two from Wander, who did not disclose how he had obtained them. Butzler did not give these items to Portella, but instead turned them over to Elsie Hillman, a Republican National Committeewoman and Peirce's mentor. Hillman in turn delivered them to Peirce, who then contacted Portella. Shortly thereafter, Peirce met with Portella in a motel room. After insisting that there had been no attempt to extort him, Peirce destroyed the photographs and tapes. Portella filed a report with the FBI concluding the investigation, but without making reference to the destruction of the items.

The incident remained dormant until the summer of 1976 when it resurfaced during an extensive investigation of the bail bond practices in Allegheny County. Currie, Peirce, Butzler, Portella, and Hillman appeared before a grand jury, but no indictments were returned. In early 1978, the transcripts from the earlier session were read to a second grand jury which also heard "live" testimony from an investigating agent. This grand jury indicted Wander and Reddington on one count of conspiracy and on six substantive counts of violating the Travel Act.

Prior to trial, the Pittsburgh Post-Gazette published an article disclosing the existence of a memorandum prepared by Assistant United States Attorney James Roark, who had been involved in the Wander-Reddington investigation. The memorandum allegedly recommended the indictment of Peirce, Portella, Butzler, and Hillman for conspiracy to commit misprision of a felony, obstruction of justice and accessory after the fact of Interstate Transportation in Aid of Racketeering. The defendants moved for disclosure of any relevant material contained in the memorandum under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963). After an *in camera* examination of the document, the district court ruled that there was no *Brady* material contained in the report.

After a trial before a jury, the defendants were convicted on the conspiracy count and three substantive counts. Acquittals were returned on the three other counts. The three substantive counts which led to convictions were based on incidents prior to the motel episode; the acquitted counts related to subsequent events.

## II. THE CONTENTIONS

The defendants raise six issues on appeal contending: (1) the activities proven in this case were insufficient to establish a violation of the Travel Act; (2) Counts I through IV of the indictment were insufficient to charge defendants with conspiracy and violation of the Travel Act; (3) the district court erred in holding that there was no abuse of the grand jury process; (4) the Government violated the *Brady* doctrine by withholding certain evidence; (5) the district court erred in modifying a jury instruction; (6) the FBI agent's participation in the destruction of photographs and recordings violated the Due Process Clause and barred conviction in this case. We hold that Counts II through IV of the indictment were insufficient under Fed.R.Crim.P. 7(c) and must be dismissed. We hold further that the district court's modification of the jury instruction was a violation of Fed. R.Crim.P. 30 and requires that the conviction on Count I be reversed. Because of the possibility of a new trial, *see United States v. Ball*, 163 U.S. 662, 672, 16 S.Ct.

1. The Travel Act, 18 U.S.C. § 1952 (1976), provides in pertinent part:

 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

 . . . . .

 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

1192, 41 L.Ed. 300 (1896), we believe that it is necessary to express our disagreement with the other contentions raised by the defendants.

Defendants also appeal from the denial of a new trial requested under Fed.R.Crim.P. 33. The motion was based on newly discovered evidence which indicated that a juror failed to respond accurately to a particular question posed on voir dire. Because all of the convictions are being reversed on other grounds, we dismiss the appeal from the denial of the motion for a new trial as moot.

## III. THE ISSUES

A. *Whether the activities proven in this case were sufficient to establish a violation of the Travel Act.*

In this section, we will consider two separate contentions raised by the defendants. The first is whether the conduct of the defendants established the interstate nexus required by the Travel Act. The second is when extortion is charged under the Travel Act whether the Government must prove a "business enterprise."

1. *Sufficiency of interstate activities.*

A violation of the Travel Act occurs when a person travels in interstate commerce or uses any facility in interstate commerce to promote any unlawful activity as defined by the Act.[1] The convictions on the substantive counts in this case related to the two interstate telephone calls made by Wander and Reddington to Currie while she

 (b) As used in this section, "unlawful activity" means (1) any business enterprise involving gambling, liquor on which Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 102(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which they are committed or of the United States.

was in Florida and Currie's Florida to Pittsburgh plane ride. The defendants contend that the "minimal and fortuitous involvement in interstate commerce" is insufficient to satisfy the interstate nexus requirement of the Travel Act. Although conceding that the activities proven at the trial fall within one possible reading of the language of the Travel Act, they argue that principles of federalism and prior case law compel a stricter construction of the interstate nexus requirement than one that would reach the conduct in this case. We disagree.

The Supreme Court in *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), held that where the defendants ran a gambling establishment, the attendance of out-of-state customers at the establishment was an insufficient nexus to interstate commerce to permit conviction under the Act. The Court believed that the Act was aimed primarily at organized crime and that Congress did not intend overly broad application of the Travel Act which "would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies." *Id.* at 812, 91 S.Ct. at 1059. Thus, in certain circumstances, "the use of interstate facilities [will be] so minimal, incidental, and fortuitous, and so peripheral to the activities" of the defendants, that conviction under this Act will be barred. *United States v. Isaacs*, 493 F.2d 1124, 1146 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 146 (1974).

■ Even with these considerations in mind, we must not construe this Act too narrowly. There is "no requirement that the use of the interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities makes easier or facilitates the unlawful activity." *United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978). Conversely, where the use of interstate facilities or

interstate travel has been deemed an essential part of the scheme, such use or travel cannot be considered "minimal," "incidental," or "fortuitous." *United States v. Craig*, 573 F.2d 455, 489 (7th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). The interstate contacts in this case are not as fortuitous as they were in cases where an insufficient nexus was held to operate as a bar. *See, e.g., United States v. Isaacs, supra* (defendant accepted in-state check which cleared through out-of-state Federal Reserve Bank as bribe); *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971) (victim cashed out-of-state check in order to pay cash to defendant in extortion scheme); *United States v. McCormick*, 442 F.2d 316 (7th Cir. 1971) (defendant advertised for illegal lottery ticket salesmen in newspaper with 2–3 percent of subscribers out of state). On the other hand, the interstate contacts here were more substantial, direct, and deliberate. *See, e.g., United States v. Perrin, supra* (defendant placed telephone calls to out-of-state map service in furtherance of a conspiracy); *United States v. LeFaivre*, 507 F.2d 1288 (4th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975) (defendant accepted out-of-state checks in payment of gambling debts). *See also, United States v. Herrera*, 584 F.2d 1137, 1145–47 (2d Cir. 1978); *United States v. Peskin*, 527 F.2d 71, 75–78 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976).

■ It is true that Currie's decision to move to Florida was unrelated to the planned motel incident. The extortion scheme could have been carried out without any interstate involvement had Currie remained in Pittsburgh. However, once Currie moved to Florida it became essential to the implementation of the defendants' scheme that they use interstate facilities to secure her presence in Pittsburgh.[2] Moreover, the use of those facilities in this case was not only necessary to the completion of the planned extortion, it was also intention-

---

2. Although the dissent asserts "[a]ll the incidents were local in nature," Diss. Op., *infra* at 1264, the foregoing activities were definitely interstate in character.

al and knowing. We hold that a knowing and intentional use of interstate facilities, even though of limited duration, to carry out an extortion scheme is within the reach of the Travel Act.

*2. Definition of "unlawful activity."*

■ As indicated earlier, a Travel Act violation occurs when interstate facilities are used to promote any "unlawful activity." "Unlawful activity" is defined in the Act as follows:

> (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor . ., narcotics, or controlled substances . . or prostitution offenses . . ., or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 1952 (1976). When one parses this section, the plain meaning is evident. If the underlying offense involves gambling, liquor, narcotics, controlled substances, or prostitution, the Government must prove more than an isolated incident; it must prove a business enterprise. On the other hand, if the underlying offense involves extortion, bribery, or arson, then the business enterprise limitation does not apply.

In this case, the underlying offense involved extortion. Thus, the Government was not required to prove a business enterprise. The defendants contend that this was error. They argue that the legislative history of the Travel Act demonstrates that the business enterprise limitation in subdi-

vision (1) was intended to apply as well to subdivision (2).[3]

■ The defendants assert, and we agree, that a primary purpose of the Travel Act was to aid local law enforcement in combatting organized crime figures who could avoid apprehension by local officials by travelling interstate. *See Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *United States v. Nardello,* 393 U.S. 286, 290–91, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). Frequent references are made in the legislative history to "continuous course of conduct," "business enterprises," and "organized crime." Nonetheless, the Supreme Court has noted that "the reach of the statute clearly was not *limited* to instances in which organized criminal activity in one State is managed from another State . . .." *Erlenbaugh v. United States,* 409 U.S. 239, 247 n.21, 93 S.Ct. 477, 482 n.21, 34 L.Ed.2d 446 (1972) (Court's emphasis).

The evidence most helpful to the defendants' contention can be found in testimony before the Senate Committee of the Judiciary, (reprinted in S.Rep.No. 644, 87th Cong. 1st Sess.1961). Attorney General Robert F. Kennedy stated that the "target" of the bill

> clearly is organized crime. The travel that would be banned is travel "in furtherance of a business enterprise" which involves gambling, liquor, narcotics, and prostitution offenses or extortion or bribery. Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous

---

3. At this juncture, we are confronted with the Government's argument that the court should not look beyond the statute to determine its meaning. The Government argues that because the plain meaning of the statute is clear, the court cannot consider extrinsic evidence of congressional intent. The Government requests that we invoke the doctrine of statutory construction commonly referred to as the plain meaning rule. To the extent to which this rule is still viable, however, we believe that it has been sharply curtailed by recent Supreme Court cases:

> Although we find the statutory language to be clear, we have often stated that, "[w]hen aid to construction of the meaning of words,

as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. Culbert,* 435 U.S. 371, 374 n.4, 98 S.Ct. 1112, 1114 n.4, 55 L.Ed.2d 349 (1978); *see Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978). The rule is also of limited applicability in this Circuit: "Even if the statutes were clear on their face concerning the issues raised in this case, it still would be appropriate to refer to the legislative history." *United States v. Graves,* 554 F.2d 65, 73 n.22 (3d Cir. 1977) (en banc). We conclude that it is appropriate for us to examine the legislative history of the Act in this case.

course of conduct sufficient for it to be termed a business enterprise.

■ We are unconvinced that this evidence of legislative intent compels the result suggested by the defendants. Where the statutory language is unambiguous, as it is here, the legislative history would have to point emphatically to a different construction before the courts could rewrite the law. The history of the bill is not that clear. Despite the goal of combatting organized crime, the language of the Act reflects an intent to treat extortion, bribery, and arson differently from gambling, liquor, narcotics, and prostitution offenses. It may be that Congress viewed the former violations as more serious than the latter. Although Congress may not have wanted to punish a single violation of a state's gambling, liquor, narcotics, or prostitution laws, it may have believed that a single act of extortion, bribery, or arson, coupled with some interstate nexus, was sufficiently serious to warrant federal prohibition.

■ We believe that there is sufficient justification for interpreting the statute as written and it is not contradicted by the legislative history. Furthermore, the court of appeals cases that have considered this question have uniformly held that the business enterprise limitation does not apply to extortion. *United States v. Gooding*, 473 F.2d 425 (5th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973); *United States v. Mahler*, 442 F.2d 1172 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). Thus, we hold that where a violation of the Travel Act is charged and the underlying offense is extortion, the Government need not satisfy the business enterprise requirement in order to obtain a conviction.

B. *Whether Counts I through IV of the indictment were sufficient to charge defendants with conspiracy and violation of the Travel Act.*

The defendants claim that these four counts of the indictment fail to include an essential element of the offense, thereby necessitating their dismissal under Fed.R.

Crim.P. 7(c). We agree with the contention as to the substantive Travel Act counts but not as to the conspiracy count.

1. *The Travel Act counts.*

The parties agree that there are three elements of proof of a Travel Act violation: (1) interstate travel or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of the unlawful activity. 18 U.S.C. § 1952(a) (1976); *United States v. Polizzi*, 500 F.2d 856, 897 (9th Cir.), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Defendants assert that the Government failed to allege the third element, subsequent performance of an act in furtherance of the unlawful activity, in the indictment.

■ Fed.R.Crim.P. 7(c)(1) provides in part: "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Where insufficiency of the indictment is alleged, as here, the question is whether it is merely a technical deficiency or a deprivation of a significant protection of the indictment process. The Supreme Court has identified two important criteria for measuring sufficiency: (1) whether the indictment contains the elements of the offense intended to be charged and sufficiently appraises the defendant of what he must be prepared to meet, and (2) whether it is specific enough to make a plea of double jeopardy possible. *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 34 L.Ed.2d 306 (1962). The Third Circuit has reiterated the significance of the first consideration: "Happily, the rule that the indictment, to be sufficient, must contain all the elements of a crime . . . is still a vital part of our Federal criminal jurisprudence." *United States v. Knox Coal Co.*, 347 F.2d 33, 37 (3d Cir.), *cert. denied*, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965).

■ Defendants' assertion that the indictment fails to allege the third element of the offense is indisputable. The counts in

question read as follows (language in brackets indicates variations among the counts):

On or about [the date specified] in the Western District of Pennsylvania defendants David Wander and Edward Reddington did use and cause to be used a facility in interstate commerce, that is, [an interstate call to Currie by one of the defendants or an interstate commercial airline trip] with intent to [or defendants 'then having the intent to'] promote, manage, establish, carry on and to facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, extortion of Michael Lynn Currie, and Robert N. Peirce, Jr., in violation of the laws of the Commonwealth of Pennsylvania.

In violation of Title 18, United States Code, Section 1952(a)(3) and Section 2.

As is readily apparent, no mention is made of a subsequent act in furtherance of the unlawful activity. Nor is any portion of Count I incorporated by reference. The failure to aver a subsequent overt act in furtherance of the unlawful activity renders Counts II through IV of the indictment defective and compels us to dismiss them. *See United States v. Pomponio*, 517 F.2d 460, 463 (4th Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).

■■■ The Government points out that the defendants did not raise this issue until after the Government had rested its case and when it was too late to cure the defect. Failure of an indictment sufficiently to state an offense is a fundamental defect however, and it can be raised at any time. Fed.R.Crim.P. 12(b)(2); *see, e.g., United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir.), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1976). Although "indictments which are tardily challenged are liberally constructed in favor of validity," *id.*, regardless of how liberally this indictment is read, Counts II through IV fail to charge an essential element of the crime. *See United States v. King*, 587 F.2d 956, 963 (9th Cir. 1978).

## 2. *The conspiracy count.*

The defendants contend that the conspiracy charge is also fatally defective because it fails to set forth all of the elements of the offense which the defendants allegedly conspired to commit. Again, the missing element is the subsequent act in furtherance of the unlawful activity. Although the overt acts section in the indictment appears to include the missing element, this does not cure the insufficiency. "[U]nless the charging part of a conspiracy count specifically refers to or incorporates by reference allegations which appear under the heading of overt acts, resort to those allegations may not be had to supply the insufficiency in the charging language itself." *United States v. Knox Coal Co., supra* 347 F.2d at 38; *accord, United States v. Pheaster, supra* 544 F.2d at 361. The charging portion of Count I of the indictment makes no reference to the overt acts section.

■■■ Unlike the substantive counts, we do not believe that the omission in Count I of the indictment is fatal. In a conspiracy indictment, the gist of the offense is the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act. Conspiracy indictments need not allege all of the elements of the offense which the defendants are accused of conspiring to commit. *See Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

In a conspiracy count, the conspiracy is the gist of the offense. Where, as here, the purpose of the conspiracy is the performing of acts which are made an offense by another section of the Criminal Code, every element of that offense need not be set forth. A conspiracy count need not plead the substantive offense letter-perfect because the purpose of the conspiracy may have been accomplished even though such activity fell short of completing a substantive offense.

*United States v. Knox Coal Co., supra* 347 F.2d at 38; *see United States v. Starr*, 584 F.2d 235, 237 (8th Cir. 1978).

■■■ Count I of the indictment specifically avers an agreement between the

defendant and a specific intent to commit an unlawful act. It further avers a number of overt acts in furtherance of the objectives of the conspiracy. It need not allege the essential elements of the underlying offense which is the object of the conspiracy, a requirement of an indictment charging a substantive offense. We therefore reject the defendants' contentions as to the conspiracy count and hold that it is sufficient.

C. *Whether the district court erred in holding that there was no abuse of the grand jury process by the presentation of testimony to the grand jury.*

Evidence against Wander and Reddington was originally presented to a grand jury in 1976 with Peirce, Hillman, Butzler, and Portella testifying. That grand jury did not return an indictment against Wander or Reddington. In 1978, the indicting grand jury heard live testimony only from FBI Agent Reemmer, the case agent, the transcript testimony of the other witnesses having been read to the grand jury. The defendants contend that the district court abused its discretion in not dismissing the indictments on this basis.

 The general rule concerning the propriety of the indictment procedure is that "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). It is permissible for an indictment to be based on hearsay evidence. *Id.* In addition, indictments returned after the grand jury has heard transcript testimony have been sustained. *See United States v. Chanen,* 549 F.2d 1306 (9th Cir. 1977); *United States v. Blitz,* 533 F.2d 1329, 1344 (2d Cir. 1976).

 In urging reversal, the defendants rely primarily on a rule developed in the Second Circuit in *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972). That rule has been summarized as follows:

[A]n indictment based on hearsay is invalid where (1) non-hearsay evidence is

readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and (3) there is high probability that had the grand jury heard the eye witness it would not have indicted.

*United States v. Cruz,* 478 F.2d 408, 410 (5th Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973). Although the first requirement has been met in this case, the latter two have not. The defendants argue, however, that because the prosecutor had substantial reason to doubt the credibility of the witness, the Second Circuit rule has been satisfied. Without deciding whether this principle has merit, it clearly has no applicability to the facts of the instant case. The Roark memorandum is the only evidence which the defendants suggest shows that the prosecutor doubted the credibility of the witnesses. Although not made part of the record, the confidential memorandum has been reviewed by us and we believe that it contains little more than the speculative views of a single Assistant United States Attorney. We are unconvinced that this is a sufficient basis for concluding that the Government doubted the veracity of the witnesses. We therefore hold that in this case the reading of transcript testimony of witnesses before a prior grand jury to the grand jury in a subsequent case does not amount to an abuse of the grand jury process.

D. *Whether the Government violated the Brady doctrine by withholding certain evidence.*

 The defendants contend that the Government violated the *Brady* doctrine by withholding the Roark memorandum and notes of statements made in FBI interviews. We have reviewed these contentions and we conclude that the evidence is not sufficiently "material" to compel disclosure under *Brady. See United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

E. *Whether the district court erred in modifying a jury instruction.*

After the evidence had been presented but prior to closing argument, the district

court, in compliance with Fed.R.Crim.P. 30, advised counsel for both sides as to his planned jury instructions. Included in these "chamber instructions" was the following statement:

If you find that, from the beginning, Michael Lynn Currie was a willing participant and, thus, an accomplice by reason of friendship for Reddington or Wander or otherwise in a scheme to set up Peirce in a compromising situation for extortion purposes, and that she acted throughout as such accomplice, then your verdict should be not guilty as to all counts, for the charges made in this indictment would not have been proven.

After delivering the instructions to the jury, the court realized that it had failed to charge on this point. The judge added the following instruction:

If you find that Wander and Reddington did not at any time intend to extort Currie because, from the very beginning, Michael Currie was a willing participant and, thus, an accomplice by reason of friendship for Reddington or Wander or otherwise in a scheme to set up Peirce in a compromising situation for extortion purposes, and that she acted throughout as such accomplice, then your verdict would be not guilty as to all the counts, for the charges in this indictment would not have been proven; but, on the other hand, if you find that Wander and Reddington agreed with each other to use interstate facilities to exploit Currie's fear of criminal prosecution and cause her to believe they could influence her criminal case, in order to obtain her services to extort Peirce, and they used or caused to be used interstate facilities with that intent and to thereafter perform some act to further the extortion, then you could find the Defendants guilty of conspiracy, even if Currie and Peirce were not, in fact, extorted, and even if, at some point after the Defendants' illegal agreement and use of interstate facility, Currie became a willing participant.

The variation between the chambers' instruction and the given instruction, which was objected to by the defendant, relates to Currie's role in the scheme. The chambers' instruction puts the focus on Currie's state of mind, i. e., whether she was, in fact, extorted or whether she was a willing participant. The given instruction emphasizes the defendants' state of mind, i.e., whether they *intended* to extort Currie regardless of her willingness to participate.

Apparently the given instruction was unclear to the jury for it sent a note to the court requesting clarification on the charge relating to "the need for Michael Currie to be found as a victim of extortion." After extensive discussion in chambers, the court responded, over the defendants' objections, with the following reinstruction:

You do not have to find that Michael Currie was a victim of extortion in order to find the Defendants guilty. It is not Michael Currie who is on trial; it is the Defendants Wander and Reddington. In order to find the Defendants guilty, you must find the intent of Reddington and Wander to extort Currie and the use of an interstate facility with that intent and some act thereafter to promote or facilitate extortion.

If you find that Wander and Reddington never, at any time intended to extort Currie because, from the very beginning, Currie was a willing participant by reason of friendship for Reddington or Wander or otherwise in a scheme to set up Peirce in a compromising situation for extortion purposes, and she acted throughout in a willing manner, then your verdict would be not guilty as to all counts, for the charge made in this indictment of the extortion of Currie would not have been proven.

On the other hand, if you find that Wander and Reddington agreed with each other to use interstate facilities to exploit Currie's fear of criminal prosecution and caused her to believe they could influence her criminal case, in order to obtain her services to extort Peirce, and they used or caused to be used interstate facilities with that intent and thereafter performed some act to further the extor-

tion, then you could find the Defendants guilty of conspiracy.

It is not that Michael Currie must be found a victim of extortion in order to find the Defendants guilty. What is important is the intent of Reddington and Wander to extort Currie and the use of an interstate facility with the intent and some act thereafter to promote or facilitate extortion.

The defendants contend that the variation from the chambers' instruction to those actually given constitutes a violation of Fed. R.Crim.P. 30 and entitles them to a new trial. We agree.

 Rule 30 provides in pertinent part: "The court shall inform counsel of its proposed action upon the requests [by counsel for instructions] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed." The purpose of this rule is to "require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury." *Ross v. United States*, 180 F.2d 160, 165 (6th Cir. 1950). A variance in the actual instruction from the proposed instruction will not require the granting of a new trial unless upon examination of the charge in its entirety it is determined that there was fundamental prejudice to the defendant. *United States v. Conlin*, 551 F.2d 534, 539

(2d Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *United States v. Scheffer*, 463 F.2d 567, 574 (5th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972); *United States v. Hartman*, 409 F.2d 198, 199 (3d Cir. 1969). In those circumstances where substantial compliance with Rule 30 is lacking, a new trial will be ordered. *United States v. Mendoza*, 473 F.2d 697, 701 (5th Cir. 1973).

 Prior to closing argument, the trial judge advised counsel that he would instruct the jurors to acquit the defendants if they found that Currie was a willing participant. Counsel for both defendants relied substantially on this proposed instruction in their summations.[4] A substantial portion of argument focused on Currie and her state of mind. Defense counsel attempted to portray her as a drug-using, dissolute woman whose testimony concerning her role in the scheme was incredible. When the judge delivered his instructions to the jury, however, he changed the emphasis to the defendants' intent. The jury could still convict even if Currie was a willing participant as long as the defendants intended to extort her. Whether the actual instruction reflects a better statement of the law is irrelevant. "It [is] the court's failure to advise counsel of its ruling prior to closing argument, not the soundness of that ruling, which violated Rule 30

4. Counsel for Wander argued to the jury:

On this record, it is hard—it would be very hard for any jury to believe [Currie's] testimony is credible, and it is the linchpin of the whole case, because, if you believe she is lying, then you must believe she wasn't extorted, and, if she wasn't extorted, the judge will tell you in his instructions that you must find both of these defendants not guilty.

It is critical to the case, it is the most important thing that I leave you with in my argument. Be assured of one thing. I don't say that Michael Currie lies about everything. No witness ever comes in and lies every single time they are asked a question. There is no doubt that there was a motel incident, that she was in the motel with Peirce. We are not talking about that. We are talking about the heart of her testimony. That is not the important part, whether she was in a motel room. The most important part is whether she was extorted to get her into the

motel room? That is what this case is all about.

Reddington's attorney closed in a similar vein:

In order for the Government to sustain a conviction of my client, Edward Reddington, I submit that they must prove, beyond a reasonable [doubt], that Michael Currie was a victim.

\* \* \* \* \* \*

Remember her final testimony, "Because I am viewed as a victim, it is not their intention to prosecute me." Isn't that the bottom line of this case, isn't that what motivated Michael Lynn Currie when she took that witness stand to testify and told you the far-fetched story that she expected you to believe in order that she would be considered a victim?

\* \* \* \* \* \*

I submit the evidence has proven that she was not a victim, that she was a willing accomplice.

and prejudicially affected counsel's summation." *Wright v. United States*, 339 F.2d 578, 580 (9th Cir. 1964); *see United States v. Harvill*, 501 F.2d 295 (9th Cir. 1974).[5] We therefore, hold that the material modification by the trial judge in the instructions to the jury after counsel have closed to the jury is prejudicial and violated Rule 30.

F. *Whether the FBI agent's participation in the destruction of photographs and recordings violated the Due Process Clause and barred conviction in this case.*

Prior to trial, the defendants moved to dismiss the indictment because of Agent Portella's role in the destruction of the photographs and tapes. After a hearing, the district court denied the defendants' motion. On appeal, the defendants again claim that Portella's conduct violated the Due Process Clause and bars prosecution in this case.

Generally, "where evidence has been lost or destroyed by the government, convictions may be permitted to stand only 'so long as the Government has made "earnest efforts" to preserve crucial materials and to find them once a discovery request is made.'" *Government of Virgin Islands v. Testamark*, 570 F.2d 1162, 1165 (3d Cir. 1978), *quoting from United States v. Bryant*, 142 U.S.App.D.C. 132, 141, 439 F.2d 642, 651 (1971). Regardless of whether the Government satisfied the "earnest efforts" test in this case, the defendants failed to demonstrate the materiality of the lost evidence. It may be, as the defendants contend, that the photographs and tapes "lay at the heart of this case," but they were not material to the defendants' guilt or innocence of the crimes for which they were convicted. The defendants were convicted for acts which took place prior to the motel incident. The Government never alleged that the photographs and tapes were used by the defendants to extort anyone. We fail to see the relevance of these items to the defense. *See generally United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, reprosecution of these defendants is not barred by the Due Process Clause.

## IV. CONCLUSION

Both defendants' convictions on Counts I through IV will be reversed. Counts II through IV of the indictment will be dismissed as insufficient under Fed.R.Crim.P. 7(c). Count I of the indictment is valid but the conviction under it will be reversed because of the violation of Fed.R.Crim.P. 30. No other issues raised on this appeal will bar reindictment or reprosecution of the defendants. The appeal from the denial of a new trial requested under Fed.R. Crim.P. 33 will be dismissed as moot. The case will be remanded to the district court for proceedings not inconsistent with this opinion.

ALDISERT, Circuit Judge, concurring and dissenting.

This sordid record reveals wretched wrongdoing by David Wander and Edward Reddington. There were clear violations of Pennsylvania statutes prohibiting conspiracy[1] and extortion[2] which called for vigorous criminal prosecution. But the squalor of the facts that make out offenses against the Commonwealth of Pennsylvania must not influence the important threshold question presented to us: was an offense committed against the United States? I think not. I would reverse the convictions on all counts for insufficiency of subject matter jurisdiction with instructions to dismiss the indictment.

### I.

All counts of the indictment alleged substantive violations of the Travel Act, 18

---

5. The prejudice shown from the Rule 30 violation was much greater in this case than other cases where for, example, the judge corrected an error in his proposed instruction before defense counsel got to that point in his closing argument. *United States v. Bautista*, 509 F.2d 675, 678 (9th Cir.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

1. 18 Pa.C.S.A. § 903.

2. 18 Pa.C.S.A. §§ 3923, 4702.

U.S.C. § 1952,[3] or conspiracy to violate the Travel Act, under 18 U.S.C. § 371. Yet I believe that the interstate travel and use of interstate facilities in this case were but casual and incidental occurrences which amounted to nothing more than what Mr. Justice Marshall referred to in *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), as "a matter of happenstance." Their nexus with any subsequent attempt at extortion is insufficient to establish federal jurisdiction.

· This was strictly a local affair. Allegheny County's Clerk of Criminal Courts, Robert Peirce, an attractive new face on the local political scene, had incurred the displeasure of appellant Wander, a bail bondsman, by instituting salutary bail bond reforms. In an effort to blackmail or otherwise embarrass Peirce, Wander planned a standard soap opera scenario, placing Ms. Michael Currie in a compromising situation with Peirce and photographing them. All the incidents were local in nature, involving local people with local motivation and local objectives.

The mighty sovereignty of the United States of America was invoked only because of earlier chapters in this saga. Although she was married to another man, Ms. Currie had been living with a boyfriend, Joseph Volpini, until March 1973 when they had a lovers' quarrel in which he "ripped her clothes and . . . tore up everything." Appendix at 377. Until she could mend her heart- and clothes-rending quarrel with Volpini, Ms. Currie and her baby fled to the home of her sister who had moved from Allegheny County to Florida.

Ms. Currie's participation in the Peirce blackmail scheme was precipitated by her still earlier involvement in another plot. In May 1972, she and Volpini had been in an automobile accident in Allegheny County. In the process of prying the cars apart, traffic officers discovered a quantity of marijuana, resulting in state criminal charges being lodged against the lovers. They stood trial without a jury and were awaiting the judge's decision at the time Currie went to Florida. Wander, whose firm had posted her bond, and Reddington threatened that she would be convicted of the drug charge and lose custody of her baby unless she played the tarnished ingenue in the motel scene with Peirce.

Now how does federal jurisdiction enter this *mise en scène?* It enters, the government contends with a straight face, because of three circumstances. First, there was a Wander to Currie long-distance telephone call placed between March 1 and March 12, 1973 about which the parties cannot remember what was discussed. Second, there was a Reddington to Currie long-distance call on March 12 in which he notified her that she had to return to Pittsburgh to appear before the state judge for his decision. The third factor, says the government, was Currie's plane trip from Florida to Pittsburgh for the express purpose of receiving the verdict of the state judge.

Upon Currie's arrival in Pittsburgh to appear in court, however, Wander and Reddington booked her into the Quality Court motel for what could be called a "photographic opportunity." The unlawful activity which followed and to which the uses of interstate commerce were connected was the motel incident. That event occurred wholly in Allegheny County, as did each substantive event and transaction which related to the incident. With the sole excep-

---

3. 18 U.S.C. § 1952 provides in relevant part:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to . . . (3) . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified [above], shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor . . . , narcotics or controlled substances . . . , or prostitution offenses . . . , or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

tion of Michael Currie, every person who played any substantial role in the events, throughout the entire period covered by the indictment, was residing and working in Allegheny County. These facts are critical, because the teachings of the Supreme Court in cases at the limits of federal jurisdiction under the Travel Act—and it must be acknowledged that this is a borderline case—require that the Act be given a scope no broader than necessary to encompass those functions which Congress expressly, or by fair implication, contemplated would be served by the Act.

## II.

The Travel Act's legislative history has already been treated in depth. *See* Judge Friendly's thorough discussion in *United States v. Archer*, 486 F.2d 670, 678–80 (2d Cir. 1973); *see also* Justice, then Judge, Stevens' treatment in *United States v. Altobella*, 442 F.2d 310, 313–14 (7th Cir. 1971). The Supreme Court has announced the following precepts to guide the interpretation of the Act. First, "§ 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another," *Rewis v. United States*, 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). Second, "an expansive [reading of the] Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of [participants], a matter of happenstance, would transform relatively minor state offenses into federal felonies." *Id.* at 812, 91 S.Ct.

at 1059. Third, neither statutory language nor legislative history supports a broad interpretation of § 1952, *id.*, and fourth, ambiguity in the Travel Act should be resolved in favor of lenity. *Id.; see also United States v. Bass*, 404 U.S. 336, 347–48, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

It is these precepts which determine where the jurisdictional line is to be drawn. Only then can we tell on which side of that line our case falls. I believe this approach is preferable to any attempt at "color matching" precedents.[4] I do not find it useful to list precedents from the circuits as the majority does, Majority Opinion at 1256–1257, and then to assess our jurisdiction on the basis of a personal judgment that the relevant facts here are more like those of one case than those of another. To me there has to be a more rational and neutral test than the highly subjective comparisons of, for instance, in-state checks cleared through out-of-state banks with out-of-state checks drawn to cover gambling debts, or of local newspapers subscribed to by out-of-state residents with interstate phone calls to out-of-state map services.

At oral argument I posed a question which government counsel, and now the majority, answered affirmatively:

> Assume that all the activity took place in Philadelphia, Pennsylvania and that Ms. Currie left Philadelphia only long enough to have lunch across the river in Camden, New Jersey. Assume further that during lunch she received a phone call, and her return to Philadelphia from Camden was in response thereto. Would there be federal jurisdiction under the Travel Act?

4. The phrase is from Cardozo:

> [T]he work of deciding cases in accordance with precedents that plainly fit them is a process similar in its nature to that of deciding cases in accordance with a statute. It is a process of search, comparison, and little more. Some judges seldom get beyond that process in any case. Their notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread out upon their desk. The sam-

> ple nearest in shade supplies the applicable rule. But, of course, no system of living law can be evolved by such a process, and no judge of a high court, worthy of his office, views the function of his place so narrowly. If that were all there was to our calling, there would be little of intellectual interest about it. The man who had the best card index of the cases would also be the wisest judge.
> B. Cardozo, The Nature of the Judicial Process, 20–21 (1921).

I don't think so. The question was inspired by Judge Henry Friendly's belief that "[t]he Founding Fathers . . . would have been surprised to find the federal courts trying cases of corruption of the New York City administration simply because one of the participants has rowed across the Hudson in the course of the criminal venture." H. Friendly, Federal Jurisdiction: A General View 61 (1973). I will go one step further: I believe that the late Attorney General Robert F. Kennedy and his Justice Department colleagues who sponsored the Travel Act, as well as the members of Congress who enacted it, would be equally surprised to learn that such was their legislative intention.

### III.

While conceding that it would go beyond the proper exercise of judicial power to confine the Travel Act to the precise purpose stated to the Congress by the Attorney General who drafted the bill in the first instance,[5] I recognize that the jurisprudential era is long past when courts will interpret a penal statute according to its literal words. We no longer follow the literal rule of statutory interpretation.[6] Rather, "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'". *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).

Our ultimate aim is to ascertain the intention of Congress in enacting a statute; that intention, when discovered, must prevail. *United States v. American Trucking Associations,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Our responsibil-

ity is to construe the statute in accordance with the maxim that an ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity. *Dunn v. United States,* —— U.S. ——, ——, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); *United States v. Naftalin,* —— U.S. ——, ——, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978). Although we are taught not to manufacture ambiguity where none exists, the Supreme Court has found ambiguity in the Travel Act in the very issue under discussion, *Rewis, supra,* 401 U.S. at 812, 91 S.Ct. 1056. It therefore becomes our responsibility to construe the statute in accordance with this maxim, not, however, so strictly as to defeat the obvious intention of the legislature. *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974). "[T]o ensure that the legislature speaks with special clarity when marking the boundaries of criminal conduct, the courts must decline to impose punishment for actions that are not ' "plainly and unmistakably" ' proscribed. *United States v. Gradwell,* 243 U.S. 476, 485 [, 37 S.Ct. 407, 61 L.Ed. 857] (1917) . . ." *Dunn v. United States, supra,* —— U.S. at ——, 99 S.Ct. at 2197.

### IV.

"The principal justification for federal jurisdiction over offenses not impacting directly on primary federal interests is the need for investigative and procedural facilities that can respond to modern, sophisticated, national or international crime beyond the reach of local police and district attorneys."[7] In the Travel Act, Congress created federal jurisdiction to fill that limited need. Its legislative history indicates an

---

5. *See United States v. Archer, supra,* 486 F.2d at 679-80.

6. "If the language of a statute be plain, admitting of only one meaning, the Legislature must be taken to have meant and intended what it has plainly expressed, and whatever it has in clear terms enacted must be enforced though it should lead to absurd or mischievous results."

Lord Atkinson, in *Vacher & Sons Ltd. v. London Society of Compositors,* [1913] A.C. 107, 121–22 (House of Lords).

7. Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy,* 65 Georgetown L.J. 1171, 1209–10 (1977).

intent to strike "at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." *Rewis, supra,* 401 U.S. at 811, 91 S.Ct. at 1059. The federal courts have been admonished not to give the language of the statute a literal meaning. *Rewis,* for example, held that "interstate travel by mere customers of a gambling establishment" does not give rise to a federal interest sufficiently worthy of protection to establish jurisdiction under the Act. *Id.*

Accordingly, with Judge Friendly I cannot accept an interpretation of the Act that "if read literally, would cover a $10 payment to fix a traffic ticket if only the person desiring the fix walked across the state line to pay off the policeman." *United States v. Archer, supra,* 486 F.2d at 679. Yet using the majority's test of "substantial, direct and deliberate" and "essential," federal jurisdiction would probably vest under such a hypothetical situation.[8]

Although I am not persuaded that any litmus paper test can be devised, I believe that at a minimum the federal courts must conduct a principled examination of each specific set of circumstances. The following analysis is suggested. If the "unlawful activity" is clearly of the type described by the Attorney General in the presentation of his bill, and discussed by the legislators in available legislative history, including committee reports, the inquiry should stop since federal jurisdiction will be established. If the activity is not reasonably encompassed by this history, then in order not to "alter sensitive federal-state relationships" or "overextend limited federal police resources," the courts should consider at least two factors.

The first is the capacity of the federal prosecutor to manage both the investigation and prosecution effectively. If the unlawful activity involves use of interstate facilities by the principals on such a scale that local investigation and prosecution would be ineffective, then it may be concluded that a federal interest is implicated. The determination that a federal interest exists is extremely sensitive, however, because federal prosecutorial intervention has a significant effect on federal-state relations. When federal authorities intervene, more than bruised sovereign egos may surface. Federal prosecution in a particular case may signal to local authorities that federal intervention is federal preemption of the entire field of similar cases in the future. We must evaluate the likelihood that the local authorities will yield to the federal authorities and abdicate their responsibility to police and prosecute traditionally local offenses. The injury to society which would result from the absence of prosecution by either local or federal authorities must be averted. It would not be unreasonable for local authorities to say, "If the feds want *this* case, they can have *all* of them." The capacity of the federal prosecutor's office to manage investigation and prosecution of purely local matters with only tangential interstate overtones is thus properly measured not by its ability to handle an isolated case, but by its capacity to handle all subsequent similar cases and by the likelihood that it will do so. We must recognize the possibility of a hiatus in law enforcement if the federal authorities decide not to preempt an entire field once they have intervened in a particular case.

The second factor is the capacity of the local prosecutor, with or without federal assistance, to investigate and prosecute effectively. This may be considered a corollary of the first, and implicates the quality and quantity of interstate contacts associated with what would otherwise be a purely

---

**8.** Indeed, using the majority's test, federal jurisdiction would have vested in *United States v. Altobella, supra; United States v. Archer, supra, United States v. McCormick,* 442 F.2d 316 (7th Cir. 1971); *United States v. Presley,* 478 F.2d 163 (5th Cir. 1973); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 146 (1974).

local matter. It would include consideration of the problems of venue, expense, extradition, and any practical difficulties which might be encountered by a local authority in extending its investigative arm beyond state lines. Another dimension of local capacity to be measured by the federal prosecutor is whether state prosecution is likely to be ineffective, either deliberately or otherwise.

Although these factors may appear to be appropriate for the consideration of federal prosecutors only,[9] I believe the federal courts also have a profound responsibility to prevent the adverse social consequences that would flow from the failure of both state and federal authorities to take action in the wake of casual or sporadic federal intervention in particular local matters. Federal courts must understand that although we may have the power to give an interpretation of a federal criminal statute beyond the purpose explicitly stated in its legislative history, we must also consider the ultimate jurisdictional and social effects of our action. It is one thing for the executive branch, through an eager government agent or young assistant United States Attorney , to find a case sufficiently newsworthy to demonstrate the diligence of the federal prosecutor's office; it is quite another thing for the judiciary, under less political pressure and with all-pervasive accountability, to affix the imprimatur of binding precedential significance that will have weighty consequences beyond the individual case. This is precisely what the Supreme Court meant when it alluded to federal prosecution that "would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of [participants], a matter of happenstance, would transform relatively minor state offenses into federal felo-

nies." *Rewis, supra,* 401 U.S. at 812, 91 S.Ct. at 1059.

## V.

Faced with circumstances which Congress did not specifically intend to cover by the Travel Act, the courts must always revert to the precepts set forth in *Rewis.* In considering these, I am impressed that Ms. Currie, the only interstate traveller, was not herself indicted for violating the Travel Act, but rather was portrayed as a victim of the criminal activities of the appellants. Furthermore, other than the minimal, incidental and fortuitous use of interest facilities and travel in this case, the planning and execution of the offense was local. The criminal offense was not shown to require the full federal prosecutorial facilities which are capable of responding to modern, sophisticated national or international crime beyond the reach of local police and district attorneys. The federal prosecutor was not shown to have committed his office to investigate and prosecute all similar types of future activity. I would conclude that there was not a sufficient nexus between the unlawful activity and the interstate travel or use of interstate facilities, nor was the unlawful activity of the scope comprehended by the Travel Act. Therefore no federal jurisdiction existed. I would reverse the convictions with a direction to dismiss the indictment.

---

9. I have drawn from the perceptive observations of Professor Charles F. C. Ruff, former Director, Watergate Special Prosecution Force, now Assistant Deputy Attorney General of the United States. *See* Ruff, *supra* note 7, at 1213.